1    **WO**

2

3

4

5

6                    **IN THE UNITED STATES DISTRICT COURT**

7                        **FOR THE DISTRICT OF ARIZONA**

8

9    Meadowlark Lemon, a married man,          )    No. CV-04-299-PHX-DGC
                                               )
10            Plaintiff/Counterdefendant,      )    No. CV-04-1023-PHX-DGC
                                               )
11   vs.                                       )    (Consolidated Cases)
                                               )
12   Harlem Globetrotters International, Inc., )    **ORDER**
     an Arizona corporation; Harlem            )
13   Globetrotters International Foundation,    )
     Inc., an Arizona corporation; Mannie L.   )
14   Jackson and Catherine Jackson, husband    )
     and wife; FUBU the Collection, L.L.C., a  )
15   New York limited liability company,       )
                                               )
16            Defendants/Counterclaimant.      )
     _____ )
17                                             )
     Fred "Curly" Neal; Larry "Gator"          )
18   Rivers; Dallas "Big D" Thornton; Robert   )
     "Showboat" Hall; Marques Haynes; and      )
19   James "Twiggy" Sanders,                   )
                                               )
20            Plaintiffs,                      )
                                               )
21   vs.                                       )
                                               )
22   Harlem Globetrotters International, Inc.,  )
     an Arizona corporation; Harlem            )
23   Globetrotters International Foundation,    )
     Inc., an Arizona corporation; Mannie L.   )
24   Jackson and Catherine Jackson, husband    )
     and wife; FUBU the Collection, L.L.C., a  )
25   New York limited liability company;       )
     GTFM of Orlando, L.L.C. d/b/a FUBU        )
26   Company Store, a Florida corporation;     )
     and GTFM, L.L.C., a New York limited      )
27   liability company,                        )
                                               )
28            Defendants.                      )
     _____ )

1    Plaintiff Meadowlark Lemon and Plaintiffs Fred "Curly" Neal, Larry "Gator" Rivers,

2    Dallas "Big D" Thornton, Robert "Showboat" Hall, Marques Haynes, and James "Twiggy"

3    Sanders ("Neal Plaintiffs") are former players for the Harlem Globetrotters.  Plaintiffs allege

4    that they are well-known sports celebrities and that their names, likenesses, and player

5    numbers are trademarks ("Marks").

6    Defendant Harlem Globetrotters International ("HGI") licensed the Marks to

7    Defendant GTFM.  HGI contends that it had the right to license the Marks pursuant to the

8    Plaintiffs' contracts with HGI's predecessors.  GTFM used the Marks on a clothing line that

9    included shirts, jerseys, dresses, skirts, and similar items sold in commerce ("Apparel").

10   Plaintiffs allege that Defendants did not have the right to license or use the Marks.

11   Plaintiffs assert claims against Defendants for violation of Section 43(a) of the

12   Lanham Act, invasion of the right of publicity, unjust enrichment, and false light invasion

13   of privacy.  Docs. ##76, 85.  Plaintiff Lemon also asserts a defamation claim against

14   Defendants HGI, Harlem Globetrotters International Foundation ("HGIF"), and Mannie and

15   Catherine Jackson.  Doc. #76.  HGI asserts a Lanham Act counterclaim against Lemon.

16   Doc. #83.  The parties have filed cross motions for summary judgment that will be addressed

17   in parts II and III of this order.  The parties have filed a variety of additional motions that will

18   be addressed in parts IV and V.[1]

19   **II.    Plaintiffs' Claims.**

20   Summary judgment is appropriate if the evidence, viewed in the light most favorable

21   to the nonmoving party, "show[s] that there is no genuine issue as to any material fact and

22   that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see*

23   *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  "Only disputes over facts that might

24   _____

25   [1]At a June 2, 2006 hearing on the pending motions, the Court granted Defendants
     FUBU the Collection's and GTFM of Orlando's motion for summary judgment and denied
26   Plaintiffs' motion to voluntarily dismiss as moot.  Docs. ##174, 185.  For the reasons stated
     on the record, FUBU the Collection and GTFM of Orlando were dismissed for lack of
27   personal jurisdiction.  The Court will deny as moot Defendants' motion to strike the affidavit
     of Peter Gallo, which addressed sales in the Phillipines.  *See* Docs. ##411, 413, 416.
28

1  affect the outcome of the suit . . . will properly preclude the entry of summary judgment."

2  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The disputed evidence must be

3  "such that a reasonable jury could return a verdict for the nonmoving party."  *Id*. at 248.

4  Summary judgment may be entered against a party who "fails to make a showing sufficient

5  to establish the existence of an element essential to that party's case, and on which that party

6  will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.

7          **A.**    **Count I – Violation of Section 43(a) of the Lanham Act.**

8         Plaintiffs allege in Count I that Defendants have violated Section 43(a) of the Lanham

9  Act, 15 U.S.C. § 1125(a).  Docs. ##76 ¶¶ 25-35, 85 ¶¶ 31-41.  Section 43(a) creates civil

10 liability for any person who, on or in connection with any goods, uses in commerce any name

11 or symbol which "is likely to cause confusion . . . as to affiliation, connection, or association

12 of such person with another person, or as to the origin, sponsorship, or approval of his or her

13 goods[.]" 15 U.S.C. § 1125(a)(1).  Plaintiffs allege that Defendants' use of the Marks on the

14 Apparel violates Section 43(a) because it falsely implies to consumers that Plaintiffs have

15 endorsed the Apparel.  Docs. ##76 ¶ 29, 85 ¶35.

16        Defendants move for summary judgment on Count I on the grounds that Plaintiffs

17 have presented no evidence of "secondary meaning" or "likelihood of confusion" with

18 respect to the Marks.  Plaintiffs move for summary judgment on the grounds that they are

19 well-known sports celebrities and Defendants' use of the Marks on the Apparel is likely to

20 confuse consumers as to whether Plaintiffs have endorsed the Apparel.

21              **1.**    **Secondary Meaning.**

22       "Secondary meaning is the consumer's association of the mark with a particular

23 source or sponsor."  *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1291 (9th Cir.

24 1992); *see Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1354 (9th Cir. 1985) ("The

25 basic element of secondary meaning is . . . the mental association by a substantial segment

26 of consumers and potential consumers 'between the alleged mark and a single source of the

27 product.'") (citation omitted).  Defendants argue that the Marks are weak "descriptive" marks

28 that must acquire secondary meaning to be protected under the Lanham Act.  Docs. ##184

1   at 10-13, 196 at 3-6.  Defendants cite *E. & J. Gallo Winery* for the proposition that "[w]hile

2   personal names used as trademarks are not inherently distinctive, they are treated as strong

3   marks upon a showing of secondary meaning."  967 F.2d at 1291.  Defendants argue that the

4   same is true for player numbers.  *See* 2 J. Thomas McCarthy, *McCarthy on Trademarks &*

5   *Unfair Competition* ("*McCarthy*") § 7:15 (4th ed. 2005) ("Numbers, like any symbol, are

6   capable of being descriptive of the goods on which they are used, and thus require proof of

7   secondary meaning for protection[.]").  Defendants assert that they are entitled to summary

8   judgment because Plaintiffs have presented no evidence that the Marks have acquired

9   secondary meaning.  *Id.*

10        Plaintiffs contend that their names, when combined with their nicknames and player

11   numbers, are "fanciful" marks and therefore are inherently strong and need not acquire

12   secondary meaning to be protected under the Lanham Act.  Doc. #256 at 10.  Plaintiffs cite

13   *McCarthy* § 7:15 for the proposition that a number can be used in combination with letters

14   or words to present a fanciful mark that requires no proof of secondary meaning.  *McCarthy*

15   gives "V-8" vegetable juice and "CHANEL No. 5" perfume as examples.  *Id.*

16        The Court concludes that both parties' arguments are inapposite.  In false endorsement

17   cases such as this one, the "mark" is the celebrity's persona.  *See Downing v. Abercrombie*

18   *& Fitch*, 265 F.3d 994, 1007 (9th Cir. 2001) (citing *White v. Samsung Elecs. Am. Inc.*, 971

19   F.2d 1395, 1400 (9th Cir. 1992) ("In cases involving confusion over endorsement by a

20   celebrity plaintiff, 'mark' means the celebrity's persona.").  A celebrity's persona is neither

21   descriptive of a good or service nor "fanciful" within the meaning of trademark law.  For

22   example, the persona of Meadowlark Lemon – his image, name and jersey number – does

23   not describe a good or service sold in commerce.  Nor is it merely fanciful phrase like V-8

24   vegetable juice.  Rather, Plaintiff's Lemon's persona is a uniquely distinguishing

25   characteristic that calls to mind a specific person and his publicly known sports personality.

26   As the Ninth Circuit has explained, "[a] false endorsement claim based on the unauthorized

27   use of a celebrity's identity is a type of false association claim, for it alleges the misuse of

28   a trademark, *i.e.*, a . . . uniquely distinguishing characteristic[] which is likely to confuse

consumers as to the plaintiff's sponsorship or approval of the product." *Waits v. Frito-Lay, Inc.*, 978 F.2d 1093, 1110 (9th Cir. 1992).  The inquiry in this case, then, is not whether Plaintiffs' personas are descriptive or fanciful as the parties have argued, nor whether the personas have acquired secondary meaning.  Rather, the relevant question is whether the use of Plaintiff's personas is likely to confuse consumers as to Plaintiff's sponsorship or approval of the Apparel.  "Under the law of false endorsement, likelihood of customer confusion is the determinative issue." *Cairns v. Franklin Mint Co.*, 292 F.3d 1139, 1149 (9th Cir. 2002).[2]

### 2.    Likelihood of Confusion.

Because Plaintiffs claim that Defendants' use of their personas is likely to cause consumer confusion as to Plaintiff's sponsorship or approval of the Apparel, Plaintiffs bear the burden of proving likelihood of confusion. *See Lindy Pen Co. v. Bic Pen Corp.*, 725 F.2d 1240, 1243 (9th Cir. 1984); *M2 Software, Inc. v. Madacy Entm't*, 421 F.3d 1073, 1081 n.6 (9th Cir. 2005).  Courts have developed an eight-factor test for determining whether a likelihood of confusion exists.  Although the test has been developed for a range of Lanham Act claims and some factors are therefore less relevant than others in a false endorsement case like this, the Court will address all eight factors.  They include (1) the strength of the marks, (2) the relatedness of the goods, (3) the similarity of the marks, (4) the evidence of actual confusion, (5) the marketing channels used, (6) the types of goods and degree of purchaser care, (7) Defendants' intent in selecting the mark, and (8) the likelihood of expansion of the product line. *See AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979); *White*, 971 F.2d at 1400 (applying the *Sleekcraft* factors in a false endorsement case).

---

[2]The inapposite nature of the parties' arguments is illustrated by the fact that the cases they cite regarding secondary meaning all involve false designation of origin claims brought by providers of goods or services against their competitors. *See E. & J. Gallo Winery*, 967 F.2d 1280; *Levi Strauss & Co.*, 778 F.2d 1352; *Japan Telecom, Inc. v. Japan Telecom of Am., Inc.*, 287 F.3d 866 (9th Cir. 2002); *Filipino Yellow Pages, Inc. v. Asian Journal Pubs., Inc.*, 198 F.3d 1143 (9th Cir. 1999)); *Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc.*, 419 F.3d 925 (9th Cir. 2005). This is not such a case.  The parties have cited no false endorsement case addressing secondary meaning, and the Court has found none.

1                          **a.        Strength of the Marks.**

2        In false endorsement cases, the "strength" of the mark is the level of recognition that

3  the celebrity has among consumers of the allegedly infringing goods. *See Downing*, 265 F.3d

4  at 1007 (citing *White*, 971 F.2d at 1400); *Wendt v. Host Int'l, Inc.*, 125 F.3d 806, 812 (9th

5  Cir. 1997) (stating that the issue under Section 43(a) is whether there is "a likelihood of

6  confusion *to consumers*" of the allegedly infringing goods) (emphasis in original).

7        Plaintiffs played for the Harlem Globetrotters at various times from 1947 to 1991.

8  Defendant GTFM entered into a licensing agreement with Defendant HGI on June 1, 2002

9  and began selling the Apparel thereafter.  Plaintiff Lemon has presented evidence that he is

10  one of the most recognized Harlem Globetrotters players and that he has been inducted into

11  the Basketball Hall of Fame. Doc. #282 at 7 (citing evidence). The Neal Plaintiffs assert that

12  they too are well-known "due to world wide fame." Doc. #288 at 7.  But in a court case such

13  as this, parties may not merely rely on facts they regard as widely known.  They must present

14  evidence to support their claims.  The motion and briefing filed by the Neal Plaintiffs present

15  no evidence to support their assertion of world-wide fame.

16        Moreover, none of the Plaintiffs have presented evidence regarding the level of

17  recognition they have *among consumers of the Apparel*.   Again, Plaintiffs may believe that

18  such a fact is self-evident, but they have the burden of proving their claims in court.  They

19  have come forward with no such proof.  Absent evidence that actual or potential consumers

20  of the Apparel recognize Plaintiffs as former Harlem Globetrotters players, Plaintiffs fail to

21  carry their burden of proof. *See Newton v. Thomason*, 22 F.3d 1455, 1461 (9th Cir. 1994)

22  ("Newton in no way showed name recognition broad enough to cover those viewers in all

23  sections of the country to whom Appellees direct the TV Series and its advertisements.  In

24  the overall scheme of things, given the limited appeal of his work and considering the

25  evidence before the court on summary judgment, Newton's 'mark' is not strong."); *see also*

26  *Sullivan v. CBS Corp.*, 385 F.3d 772, 777 (7th Cir. 2004) ("Sullivan claims that his mark is

27  famous enough to make consumers think the [Survivor] Series merchandise is likely to come

28  from his band.  But he offered no evidence to back up this guess. . . .  There is simply no

1  evidence that 'Survivor' the Band enjoys fame and recognition as the originator of any

2  products other rock albums and concert t-shirts.").[3]  This factor favors Defendants.

3       The Neal Plaintiffs contend in their reply brief that they are so well known that the

4  Court may take judicial notice of acquired secondary meaning, i.e., that the Marks are strong.

5  Doc. #319 at 7 (citing Fed. R. Evid. 201).  Rule 201 provides that "[a] judicially noticed fact

6  must be one *not subject to reasonable dispute*[.]"  Fed. R. Evid. 201(b) (emphasis added).

7  Defendants reasonably dispute the contention that the Marks are strong among consumers

8  of the Apparel.  Rule 201 further provides that "[a] court shall take judicial notice if

9  requested by a party and *supplied with the necessary information*."  Fed. R. Evid. 201(d)

10  (emphasis added).  As explained above, Plaintiffs merely assert that they enjoy "world wide

11  fame."  Doc. #288 at 7.  They provide no supporting information.  The Court will deny

12  Plaintiffs' request that the Court take judicial notice that the Marks are strong.[4]

13

14

---

15     [3]Reported cases include examples of plaintiffs coming forward with the kind of

16  evidence that is lacking in this case. *See Downing*, 265 F.3d at 1008 ("Appellants cite to a
declaration submitted by surf historian Steve Pezman.  In the declaration, Pezman asserts that

17  Appellants 'are considered legends in the surf community and are *still* well-known and
regarded.'") (emphasis added); *Waits*, 978 F.2d at 1111 (stating that the plaintiff presented

18  evidence that the radio commercial using an imitation of his distinctive singing voice was

19  targeted to an audience that overlapped with his audience).

20     [4]The cases cited by Plaintiffs are distinguishable.  In *Muhammad Ali v. Playgirl, Inc.*,

21  447 F. Supp. 723 (S.D.N.Y. 1978), the high level of Muhammad Ali's celebrity status was
not disputed by the defendant for purposes of a right of publicity claim.  *See id.* at 729 ("In

22  the instant case, it is undisputed that plaintiff Ali has achieved such a 'celebrated status' and
it is clear to this court that he has established a valuable interest in his name and likeness.").

23  The other cases involved marks that had longstanding trademark registrations and were so

24  famous they had attained dictionary recognition.  *See Gideons Int'l, Inc. v. Gideon 300
Ministries, Inc.*, 94 F. Supp. 2d 566, 583 (E.D. Penn. 1999) (relying on registrations since

25  1913 and stating that "the names and marks 'Gideon' and 'Gideons' are so strong that the
dictionary definition specifically refers to the plaintiff"); *B.V.D. Licensing Corp. v. Body

26  Action Design, Inc.*, 846 F.2d 727, 728 (Fed. Cir. 1988) (relying on fourteen registrations

27  issued between 1906 to 1983 and stating that dictionaries defined "B.V.D." as a trademark
used for underwear).  The Marks in this case are not registered and Plaintiffs have presented

28  no evidence that the Marks have attained dictionary or comparable recognition.

1

#### b.      Relatedness of the Goods.

2          In false endorsement cases, "'goods' concerns the source of the celebrity's fame."

3   *Downing*, 265 F.3d at 1007.  The amount of fame Plaintiffs do enjoy is based in large part

4   on their success as Harlem Globetrotters players.  Such success reasonably could be seen as

5   closely related to the Apparel, which included Harlem Globetrotters jerseys and shorts.  *See*

6   *id.* at 1008 ("Appellants' fame is due to their surfing success.  Appellants' surfing success

7   could be seen as closely-related to the Abercrombie's surf-related clothing.").  This factor

8   favors Plaintiffs.

9

#### c.      Similarity of the Marks.

10         The similarity of the Marks to Plaintiffs is clear because the Marks include Plaintiffs'

11   names and likenesses.  *See Downing*, 265 F.3d at 1008 ("Applying the third factor, the

12   similarity of the likeness, to the Appellants is clear because it is an actual photograph of the

13   Appellants with their names designated.").  This factor favors Plaintiffs.

14

#### d.      Evidence of Actual Confusion.

15         Plaintiff Lemon asserts that actual confusion is certain because "the concept of

16   celebrity endorsement of goods is common knowledge among consumers."  Doc. #197 at 7.

17   Such conclusory assertions are insufficient on summary judgment and no substitute for

18   relevant expert testimony or consumer affidavits and surveys.  *See Newton*, 22 F.3d at 22

19   F.3d at 1462 (finding no likelihood of confusion where "there was no relevant evidence of

20   actual confusion before the court on summary judgment"); *Kournikova v. Gen. Media*

21   *Communications, Inc.*, 278 F. Supp. 2d 1111, 1126 (C.D. Cal. 2003) ("Because the survey

22   . . . and expert report do not provide real evidence of actual confusion, Plaintiff raises no

23   triable issue, and this critical factor weighs heavily in GMC's favor."); *cf. Waits*, 978 F.2d

24   at 1111 (finding a likelihood of confusion where "there was evidence of actual confusion:

25   the testimony of numerous witnesses that they actually believed it was Tom Waits singing

26   the words of endorsement").

27         Plaintiffs Rivers and Thornton testified that people have told them that they thought

28   Plaintiffs had endorsed the Apparel.  Doc. #254 ¶ 58, Exs. 32-33.  As Defendants correctly

1   point out, however, this testimony, offered to prove the truth of the matter asserted – that
2   consumers did think the Apparel was endorsed by Plaintiffs – is inadmissible hearsay.  Fed.
3   Rs. Evid. 801-02.  This factor favors Defendants.

4                            **e.      Marketing Channels Used.**

5   Plaintiff Lemon does not address this factor.  The Neal Plaintiffs misconstrue this
6   factor, asserting that the legitimacy of the marketing channels used by Defendants "would
7   confuse a consumer that the clothes are authentic, and are legitimately endorsed by the sports
8   celebrities whose names appear on the garments[.]"  Doc. #288 at 8.  The issue, however, is
9   whether Defendants and Plaintiffs use similar marketing channels since "[c]onvergent
10  marketing channels increase the likelihood of confusion." *Sleekcraft*, 599 F.2d at 353.  To
11  the extent this factor is relevant to a false endorsement claim, Plaintiffs have presented no
12  evidence of similar marketing channels.  This factor favors Defendants.

13                    **f.      Types of Goods and the Degree of Purchaser Care.**

14  "Likelihood of confusion is determined on the basis of a 'reasonably prudent
15  customer.'" *Brookfield Communications, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036,
16  1060 (9th Cir. 1999) (quotations omitted); *see  Sleekcraft*, 599 F.2d at 353 (stating that the
17  standard is the typical customer exercising ordinary caution).  Generally, the greater care
18  purchasers exercise in selecting a product, the less likelihood there is of confusion.  A
19  sophisticated purchaser or a purchaser of high quality goods "can be expected to exercise
20  greater care in his purchases[.]" *Sleekcraft*, 599 F.2d at 353.

21  Plaintiff Lemon does not address this factor.  The Neal Plaintiffs state that the Apparel
22  is of high quality, but they do not directly address the amount of care a typical customer
23  would exercise when purchasing the Apparel.  Doc. #288 at 9.  Rather, Plaintiffs assert that
24  customers, no matter how sophisticated, reasonably could believe that Plaintiffs endorsed the
25  Apparel since the Apparel was "sold at J.C. Penney's, Burlington's, and even Marshall's[.]"
26  But Plaintiffs have presented no evidence such as expert testimony or a consumer survey in
27  support of this assertion. *Cf. Sleekcraft*, 599 F.2d at 353 (discussing expert testimony
28  regarding "how discriminating the average buyer actually [was]"); *Kournikova*, 278 F. Supp.

2d at 1126 ("Plaintiff's experts[] found that 75.3% of the surveyed customers spent less than 60 seconds deciding whether to purchase a magazine like *Penthouse*.").  This factor favors Defendants.

### h.  Defendants' Intent in Selecting the Marks.

Plaintiff Lemon asserts that it is clear that Defendants selected his name with the intent to make a profit.  Docs. ##197 at 7, 282 at 7.  The relevant question, however, is whether Defendants intended to profit by *confusing consumers* concerning the endorsement of the Apparel.  *See Newton*, 22 F.3d at 1463 ("Newton must show that, in selecting his name, Appellees 'intended to profit by *confusing consumers*.'") (quoting *Toho Co. v. Sears, Roebuck & Co.*, 645 F.2d 788, 791 n.2 (9th Cir. 1981) (emphasis in original)); *White*, 971 F.2d at 1400.  Defendants contend that Plaintiffs have presented no evidence that Defendants intended to profit by confusing consumers.  Defendants argue that there were many reasons for consumers to buy the Apparel, including the styles, colors, and the "FUBU" and "Harlem Globetrotters" marks.  Doc. #312 at 11.  Defendants do not dispute, however, that they knowingly used Plaintiffs' names and likenesses on the Apparel.  "'When an alleged infringer knowingly adopts a mark similar to another's, courts will presume an intent to deceive the public.'"  *Kournikova*, 278 F. Supp. 2d at 1127 (quoting *Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1394 (9th Cir. 1993)).  This factor favors Plaintiffs.

### i.  Likelihood of the Expansion of the Product Line.

A trademark owner may be afforded greater protection against competing goods where "there is a 'strong possibility' that either party may expand his business to compete with the other."  *Sleekcraft*, 599 F.2d at 354 (citations omitted).  Defendants state that it is undisputed that the line of Apparel will not be expanded since the licensing agreement has terminated.  Doc. #351 at 8.  Plaintiff Lemon does not address this factor.  The Neal Plaintiffs assert that Defendants' "actions appropriated other potential opportunities that may have been available to Plaintiffs."  Doc. #288 at 10.  But Plaintiffs present no evidence in support of this assertion.  *Cf. Wendt*, 125 F.3d at 814 (finding that the factor favored the plaintiff because he presented evidence that he intended to appear in advertisements for beer and had

1  declined offers from small breweries in order to be available to a large brewery). This factor

2  favors Defendants.

3                      **j.      Weighing the Factors.**

4        Construing the evidence in the light most favorable to Plaintiffs, only three of the

5  eight *Sleekcraft* factors weigh in their favor.  The other five factors, including the key factor

6  of consumer confusion, weigh in Defendants' favor.

7        Plaintiffs rely on *White* for the proposition that evidence of actual confusion is not

8  required to create a triable issue regarding likelihood of confusion.  Plaintiffs state that in

9  *White*, "the defendant's intent and the other factors in varying degree carried the day."  Doc.

10  #255 at 12.  In *White*, however, the defendants used the plaintiff's image to advertise video

11  cassette recorders ("VCRs") in a television commercial. 971 F.2d at 1396; *see Abdul-Jabbar*

12  *v. Gen. Motors Corp.*, 85 F.3d 407, 409 (9th Cir. 1996) (using the plaintiff's given name in

13  a car commercial); *Waits*, 978 F.2d at 1097 (using a likeness of the plaintiff's distinctive

14  voice in a Doritos commercial).  "In each of [these] false endorsement cases, the celebrities

15  images were used in commercial advertising to promote a product and clearly communicated

16  an endorsement."  *Cairns v. Franklin Mint Co.*, 107 F. Supp. 2d 1212, 1215 (C.D. Cal. 2000)

17  (citations omitted).  "Many people may assume that when a celebrity's name is used in a .

18  . . commercial, the celebrity endorses the product advertised."  *Abdul-Jabbar*, 85 F.3d at 413

19  (citing *White*, 971 F.2d at 1400-01).

20        In this case, Defendants used Plaintiffs' names and likenesses on the Apparel, but not

21  in advertisements that directly implied a direct endorsement by Plaintiffs.  Courts have found

22  that such use of a celebrity's image on a product "is vastly different from the *advertising use*

23  of celebrities' likenesses in selling . . . cars, Doritos, and VCRs."  *Cairns*, 107 F. Supp. 2d

24  at 1215 (emphasis added).  Courts conclude that the use of a plaintiff's name and likenesses

25  directly on products does not clearly communicate endorsement by the plaintiff.  *See id.* at

26  1216; *cf. White*, 971 F.2d at 1401 ("[W]e stress that we reach [our] conclusion in light of the

27  peculiar facts of this case.  In particular, we note that the robot identifies White and was part

28  of a series of ads in which other celebrities participated and were paid for their endorsement

1   of Samsung's products."); *Abdul-Jabbar*, 85 F.3d at 413 ("[U]se of celebrity endorsements

2   in television commercials is so well established by commercial custom that a jury might find

3   an implied endorsement in General Motors' use of the celebrity's name in a commercial[.]").

4        At most, Plaintiffs' evidence raises a possibility, as opposed to a likelihood, that

5   consumers would be confused as to whether Plaintiffs endorsed the Apparel.  The mere

6   possibility that consumers may be confused, however, is not sufficient to prevail on a false

7   endorsement claim.  *See Newton*, 22 F.3d at 1461-62 ("Mere possibility that a consumer may

8   be misled by Appellees' use of the name 'Wood Newton' is not enough to establish a cause

9   of action for unfair competition."); *Kournikova*, 278 F. Supp. 2d at 1127-28 ("Kournikova's

10   case founders because the 'mere possibility' that consumers may be misled is insufficient to

11   prevail on an endorsement claim.'") (citation omitted).

12        Weighing the *Sleekcraft* factors as discussed above, the Court concludes that Plaintiffs

13   have failed to present sufficient evidence for a reasonable jury to conclude that Defendants'

14   actions are likely to cause consumer confusion as to Plaintiff's sponsorship or approval of

15   the Apparel.  The Court accordingly will grant summary judgment in Defendants' favor on

16   Count I.  *See Newton*, 22 F.3d at 1462 (granting summary judgment for defendants because

17   plaintiff failed to offer sufficient evidence of likelihood of confusion); *Cairns*, 107 F. Supp.

18   2d at 1216 (finding no likelihood of confusion and granting summary judgment because the

19   use of Princess Diana's name and likeness on products did not implicate the source-

20   identification purpose of trademark protection under Section 43(a)); *Kournikova*, 278 F.

21   Supp. 2d at 1127-28 ("While some of the *Sleekcraft* factors weigh in Plaintiff's favor, a

22   number of factors, including the critical issue of actual confusion, weigh heavily in favor of

23   [Defendant]. . . .  Since Kournikova's evidence at most raises the possibility, as opposed to

24   the likelihood, of confusion, she has not met her burden of demonstrating the existence of

25   genuine issues of material fact that must be resolved at trial.").[5]

26

27

28        [5]Given this ruling, the Court need not address with respect to Count I Defendants' affirmative defenses of estoppel and laches.

**B.     Count II – Invasion of the Right of Publicity.**

Initially, the parties dispute whether a right of publicity claim even exists in Arizona. In the absence of Arizona law to the contrary, however, Arizona courts follow the Restatement.  *Pooley v. National Hole-In-One Association*, 89 F. Supp. 2d 1108, 1111 (D. Ariz. 2000) (citing *Aztlan Lodge No. 1 v. Ruffner*, 745 P.2d 611, 613 (Ariz. Ct. App. 1987)). The Restatement clearly recognizes the right of publicity, both as a tort claim and an unfair competition claim.  *See* Restatement (Second) of Torts § 652C (1977); Restatement (Third) of Unfair Competition § 46 (1995).  In addition, more than half of the states have recognized the claim.  *See Pooley*, 89 F. Supp. 2d at 1112.  The Court agrees with the conclusion in *Pooley* that Arizona would recognize a right of publicity claim, and therefore will permit Plaintiffs to assert such a claim in this case.  *See id.*; *see also Godbehere v. Phoenix Newspapers, Inc.*, 783 P.2d 781, 785-87 (Ariz. 1989) (recognizing the related claim of false light invasion of privacy).

To prevail on a right of publicity claim, a plaintiff must show  (1) the defendant's use of the plaintiff's name or likeness, (2) the appropriation of the plaintiff's name or likeness to the defendant's advantage, (3) lack of consent, and (4) resulting injury.  *See Pooley*, 89 F. Supp. 2d at 1111 (citing *Eastwood v. Superior Ct.*, 198 Cal. Rptr. 342, 346 (1983)).  The parties address two of these elements – lack of consent and resulting injury.

**1.     Lack of Consent.**

The parties dispute whether Defendants lacked consent to use Plaintiffs' names and likenesses on the Apparel.  Defendants contend that through their player contracts with HGI's predecessors Plaintiffs licensed the use of their names and likenesses in perpetuity. Plaintiff Lemon asserts that his contract permitted the use of his name and likeness only "to the extent they are put to the same uses as they were put prior to . . . termination" of the contract.  Doc. #197 at 9.  Lemon argues that Defendants lacked consent because HGI's predecessors had never used his name and likeness on clothing.  *Id.*  Defendants have presented evidence that Lemon's name and likeness was used for a variety of promotional and commercial purposes, including clothing iron-ons and product endorsements.

Docs. ##195 at 10, 257 at 15.  This evidence creates a triable issue as to whether the use of Lemon's name and likeness on the Apparel was permitted under his contract.[6]  The Court accordingly will deny summary judgment with respect to this issue.[7]

The Neal Plaintiffs argue that Defendants lacked consent because HGI did not purchase their player contracts, the contracts are executory and were extinguished in bankruptcy proceedings, and the contracts are void as unconscionable.  The Court will address each argument in turn.

### a.    Did HGI Purchase Plaintiffs' Contracts?

Defendant HGI and the Harlem Globetrotters entered into an asset purchase agreement on August 1, 1993 ("Agreement").  Pls.' Ex. 5(D).  Section 2.1 of the Agreement describes the assets purchased by HGI, including the books and records set forth in Schedule 2.1(G) and the contracts, licenses, and agreements set forth in Schedule 2.1(I).  *Id.* at 3.  Plaintiffs contend that HGI did not purchase their player contracts because the contracts are not listed on Schedule 2.1(I).  Doc. #279 at 7-8.  Defendants argue that Schedule 2.1(I) included only current player contracts and that the contracts of former players such as Plaintiffs were listed in Schedule 2.1(G).  Doc. #265 at 7-8.  The Court concludes that the relevant provisions of the Agreement are ambiguous.  There is thus a genuine issue of fact as to whether HGI purchased Plaintiffs' contracts.  *See Bethlehem Steel Co. v. Turner Constr. Co.*, 141 N.E.2d 590, 592 (N.Y. 1957) (stating that a trial is warranted if a contract is ambiguous); *Hudson-Port Ewen Assocs. v. Kuo*, 165 A.D.2d 301, 303 (N.Y. App. Div. 1991) (stating that summary judgment is inappropriate where a contract is ambiguous and the intent of the

---

[6]Given the factual issues regarding the nature of the Globetrotters' use of Plaintiffs' names and likenesses, the Court cannot say that, as a matter of law, Plaintiffs have unreasonably delayed in filing suit.  The Court accordingly will deny summary judgment with respect to Defendants' affirmative defense of laches.

[7]The Court will deny as moot Defendants' motion to strike the affidavit of James Mutum, which was offered by Lemon to show that clothing bearing player names and likenesses were not sold at Harlem Globetrotters games.  *See* Docs. ##268, 317, 355.

1  parties depends on the credibility of or inferences to be drawn from extrinsic evidence).[8] The

2  Court accordingly will deny summary judgment with respect to this issue.

3  ### b.    Are the Contracts Executory?

4          A contract is executory if "the obligations of both parties are so far unperformed that

5  the failure of either party to complete performance would constitute a material breach and

6  thus excuse the performance of the other.'"  *In re Wegner*, 839 F.2d 533, 536 (9th Cir. 1988).

7  Whether a contract is executory for bankruptcy purposes is a question of federal law.  *Id.*

8  The underlying issue of material breach, however, is generally a question of state contract

9  law.  *Id.*

10          The Neal Plaintiffs state that "every license requires continued performance by the

11  licensor in that it must . . . continue to refrain from suing the licensee for infringement[.]"

12  Doc. #279 at 14.  Plaintiffs contend that this covenant-not-to-sue obligation is sufficient to

13  support a finding that their contracts are executory under the Bankruptcy Code.  *Id.* (citing

14  *In re CFLC, Inc.*, 89 F.3d 673 (9th Cir. 1996)).  "Licensing agreements are not, however,

15  universally considered executory contracts."  *In re Qintex Entm't, Inc.*, 950 F.2d 1492, 1495

16  (9th Cir. 1991) (citations omitted).  The license at issue in *CFLC* was a nonexclusive patent

17  license governed by federal patent law. 89 F.3d at 676.  By contrast, the licenses at issue in

18  this case are governed by the contract law of various states.  *See* Pls.' Ex. 3(A)-(F).[9]

19  Plaintiffs have not shown that their respective covenant-not-sue obligations are material

20  under the applicable state law.  *See Wegner*, 839 F.2d at 536 ("The question of the legal

21  consequence of one party's failure to perform its remaining obligations under a contract and

22  whether one of the parties' failure to perform its remaining obligations would give rise to a

23  material breach is an issue of state contract law.").  The Court accordingly will deny

24  _____

25          [8]The Agreement includes a choice-of-law provision which states that the Agreement
26  shall be governed by New York law.  Pls.' Ex. 5(D) § 20.3.

27          [9]Delaware law governs Neal's contract, Minnesota law governs Sanders' contract,
Illinois law governs Haynes' and Hall's contracts, and California law governs Rivers' and
28  Thornton's contracts.  *Id.*

1    summary judgment with respect to this issue.

2                    **c.    Are the Contracts Unconscionable?**

3           The Neal Plaintiffs state that "it is both procedurally and substantively unconscionable

4    to have an employee give up rights to his name forever for no consideration in order to sign

5    an employment contract."  Doc. #279 at 10.  Plaintiffs recite the applicable state laws and

6    discuss some of the factors that courts consider in determining whether a contract is

7    unconscionable.  *Id.* at 9-12.  Plaintiffs, however, fail to cite any facts demonstrating either

8    procedural or substantive unconscionability.  Absent such facts, that Court cannot determine

9    whether the various contracts – which contain different terms and were entered into by

10   different parties over an eighteen-year span – are unconscionable.  *See Fritz v. Nationwide*

11   *Mut. Ins. Co.*, Civ. A. No. 1369, 1990 WL 186448, *5 (Del. Ch. Nov. 26, 1990) ("Mere

12   unequal bargaining power . . . will not support a finding of unconscionability because the

13   parties are free to make bad bargains.  Rather, additional factors must be present to render

14   a contract . . . unconscionable, such as one party being denied a meaningful choice and the

15   contract terms unreasonably favoring the other party."); M.S.A. § 336.2-302(2) ("When it

16   is claimed or appears to the court that the contract or any clause thereof may be

17   unconscionable the parties shall . . . present evidence as to its commercial setting, purpose

18   and effect to aid the court in making the determination."); *Ahern v. Knecht*, 563 N.E.2d 787,

19   792 (Ill. App. Ct. 1990) ("Factors relevant to finding a contract unconscionable include gross

20   disparity in the values exchanged or gross inequality in the bargaining positions of the parties

21   together with terms unreasonably favorable to the stronger party.  Courts will also look to

22   such factors as the age and education of the contracting parties, their commercial experience,

23   and whether the aggrieved party had a meaningful choice when faced with unreasonably

24   unfavorable terms.") (citations omitted); *Freeman v. Wal-Mart Stores, Inc.*, 3 Cal. Rptr. 3d

25   860, 866 (Cal. Ct. App. 2003) (stating that "unconscionability is a flexible doctrine designed

26   to allow courts to consider numerous factors in determining whether a contract is

27   unconscionable").  The Court accordingly will deny summary judgment with respect to this

28   issue.

1                 **2.**     **Resulting Injury.**

2                       **a.**     **Proper Measure of Damages.**

3         Defendants move for summary judgment on Count II on the ground that Plaintiffs

4 have presented no evidence of resulting injury.  Docs. ##184 at 20, 195 at 21.  Specifically,

5 Defendants argue that Plaintiffs seek disgorgement of Defendants' profits and that such a

6 remedy is unavailable as a matter of law because the appropriate measure of damages in a

7 right of publicity case is the "fair market value" of the right to use the plaintiff's identity.

8 Docs. ##184 at 20, 351 at 15 (citing *Clark v. America Online, Inc.*, No. CV-98-5650, 2000

9 WL 33535712, at *8 (C.D. Cal. Nov. 30, 2000); *Solano v. Playgirl, Inc.*, 292 F.3d 1078,

10 1090 (9th Cir. 2002) ("[T]he measure of damages available for misappropriation claims

11 includes the economic value of the use of an individual's name and likeness.")).  Plaintiffs

12 do not address this issue.

13         Fair market value of the unauthorized use is simply one measure of damages available

14 in right of publicity cases.  *See* Restatement (Third) of Unfair Competition ("Restatement")

15 § 49 cmt. d (stating that "courts *sometimes* apply a measure of damages based on the fair

16 market value of the unauthorized use") (emphasis added).  The Restatement makes clear that

17 "the plaintiff may recover the proportion of the defendant's net profits that is attributable to

18 the unauthorized use."  *Id.*  Once the plaintiff establishes the defendant's sales, "the

19 defendant has the burden of establishing any portion of the sales that is attributable to factors

20 other than the appropriation of the plaintiff's identity and any expenses properly deducted

21 in determining net profits."  *Id.*  Because this law clearly makes disgorgement of profits

22 available as a remedy in this case, the Court will deny Defendants' request for summary

23 judgment on this issue.

24                     **b.**     **Individual Damages.**

25         Defendant GTFM argues that Plaintiffs rely exclusively on the expert report of

26 certified public accountant Sandra Abalos to establish damages and that the report analyzes

27 damages only in the aggregate, not with respect to each individual Plaintiff.  Docs. ##184

28 at 8.  GTFM contends in its reply brief that Plaintiffs' failure to present evidence of

individual damages is fatal to their claims because damages must be proven with reasonable certainty.  Doc. #312 at 12 (citing *In re Hanford Nuclear Reservation Litig.*, 292 F.3d 1124, 1135 (9th Cir. 2002); *Abuan v. Gen. Elec. Co.*, 3 F.3d 329, 334 (9th Cir. 1993)).  The Neal Plaintiffs contend that GTFM's arguments are "directed to the weight of the expert's evidence, not its admissibility, and should not be considered for summary judgment."  Doc. #255 at 17.

As GTFM points out, however, scrutiny of Plaintiffs' damages evidence is appropriate at the summary judgment stage.  Doc. #312 at 13 n.9.  Although Defendant may have the burden of establishing any portion of the infringing sales that is not attributable to the appropriation of a Plaintiff's identity, *see* Restatement  § 49 cmt. d., Plaintiffs still bear the burden of proving *individual* damages at trial.  As the ninth Circuit has said:  "'We cannot emphasize this point strongly enough [– that] generalized proofs will not suffice to prove individual damages. . . .  [I]ndividual particularized damages . . . must be proved on an individual basis.'"  *In re Hanford*, 292 F.3d at 1135 (quoting *Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1200 (6th Cir. 1988)); *see Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1407 (9th cir. 1993) ("As a general rule, damages which result from a tort must be established with reasonable certainty."); *Andrew Brown Co. v. Painters Warehouse, Inc.*, 531 P.2d 527, 531 (Ariz. 1975) (evidence must provide a reasonable basis for estimating the plaintiff's loss with as much precision as possible; conjecture or speculation will not suffice); *Thomas v. Goudreault*, 786 P.2d 1010, 1019 (Ariz. Ct. App. 1989) (trial court erred by instructing the jury that the plaintiffs could recover damages "reasonably proved by the evidence"; the law requires that a plaintiff prove his damages with "reasonable certainty").

Thus, if Plaintiffs' evidence does not create a triable issue with respect to the damages suffered by each individual Plaintiff, summary judgment is appropriate.  *See* Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 322; *Abuan*, 3 F.3d at 334 (stating that the plaintiffs would be required to prove individual damages at trial and holding that the plaintiffs' expert reports were insufficient to preclude summary judgment for the defendants where the reports made

no attempt to establish such damages) (citing *Sterling*, 855 P.2d at 1200).[10]

In both its motion for summary judgment and statement of facts, GTFM asserts that Plaintiffs' expert report "does not analyze [P]laintiffs' alleged damages by individual [P]laintiff, but only in the aggregate." Docs. ##181 ¶ 91, 184 at 8. In response, Plaintiff Lemon states that "Plaintiffs' expert was unable to completely calculate compensation based solely on individual Plaintiffs" because of "GTFM's refusal to reliably quantify sales[.]" Doc. #247 at 9. Lemon disputes paragraph 91 of GTFM's statement of facts and asserts that the expert report estimates "damages by individual [P]laintiff as much as possible." Doc. #248 ¶ 48.[11] Plaintiffs took the same approach in their joint response to GTFM's motion to strike Plaintiffs' expert report, stating that "Plaintiffs' expert did calculate compensation based on the individual Plaintiffs as much as possible, both by player name and number as shown on the schedules used by Plaintiffs' expert." Doc. #220 (citing Ex. A, Abalos Aff. ¶ 2).

Nowhere in her expert report, however, does Abalos even purport to estimate the damages of each individual Plaintiff. *See* Doc. #182 Ex. DD. Rather, Abalos calculated the total damages against Defendants GTFM and HGI. *Id.* at 16. Abalos opines that the

---

[10]Even in class actions, proof of damages must be presented plaintiff-by-plaintiff, and generalized, broad-brush damages arguments will not suffice. *See Butt v. Allegheny Pepsi-Cola Bottling Co.*, 116 F.R.D. 486, 492 (E.D. Va. 1987) (denying class certification motion based on individual damages issues and stating: "Plaintiff's expert states, in very general terms, that statistical methods exist by which individual damages may be calculated, and plaintiff asserts that a workable formula can be developed. . . . The Court finds that plaintiff has failed to show that damages can be calculated other than through a detailed and individualized examination of hundreds of thousands of transactions."); *In re Pharm. Indus. Average Wholesale Price Litig.*, 230 F.R.D. 61, 87 (D. Mass. 2005) (denying class certification motion because "it is not permissible to use methods such as averaging damages to sweep individual issues under the judicial rug"); *In re NCAA I-A Walk-On Football Players Litig.*, No. C04-1254C, 2006 WL 1207915 (W.D. Wash. May 3, 2006) (denying class certification motion because the plaintiffs' expert offered no method for determining each plaintiff's "particular piece of the damages pie").

[11]The Neal Plaintiff have joined Lemon's statement of controverting facts. *See* Doc. #249 (joining Doc. #248).

1   damages against GTFM "is calculated to equal 100% of the gross profit earned from . . .

2   infringed sales in the minimum amount of $1,832,304" and that the damages against HGI

3   "is calculated to equal 100% of the royalties received from . . . infringed sales in the

4   minimum amount of $704,383." *Id.* at 16 ¶¶ 1-2 (citing Schedule O). Abalos made clear in

5   her deposition that her report calculated damages in the aggregate:

6       Q:      I want to know whether starting with Meadowlark Lemon whether your report
                expresses an opinion as to the amount of compensatory damages due

7               Meadowlark Lemon from GTFM, LLC?

8       A:      Right. And the question was individually and separately. And the answer
                would be no.

9
        Q:      [D]oes your report express an opinion as to the amount of compensatory
10              damages due to Curly [sic] Neal individually from GTFM, LLC?

11      A:      Not individually and separately, no.

12      Q:      Does your report contain an opinion as to compensatory damages due to any
                . . . other [Plaintiffs] individually and separately from GTFM, LLC?

13
        A:      No.
14

15      . . . .

        Q:      Does your report also not contain an opinion of compensatory damages due to
16              the individual [P]laintiffs against [HGI]?

17      A:      Individually?

18      Q:      Correct. . . . Your report does not contain that?

19      A:      No. It's in [the] aggregate.

20   Doc. #191 Ex. F, Abalos Dep. at 248-50; *see also* Doc. #182 Ex. N, Abalos Dep. at 246.

21          At the June 2 hearing, the Court asked counsel for Plaintiffs whether Plaintiffs have

22   presented any evidence of individual damages. Counsel was unable to provide specific

23   citations to any such evidence. Counsel stated, however, that an October 8, 2003 letter from

24   HGI to Plaintiff Thornton ("HGI Letter") identified certain sales on an individual basis.

25   Counsel argued that the jury could calculate from the HGI Letter the percentage of total

26   damages applicable to each Plaintiff and could apply that percentage to the aggregate

27   damages in Abalos' expert report in order to determine what each Plaintiff is entitled to

28   receive.

- 20 -

1        On June 5, 2006, the Neal Plaintiffs filed a motion for leave to answer the Court's

2    request for evidence location ("motion for leave").  Doc. #419.  Attached to a supporting

3    declaration is a sales chart prepared by Plaintiffs' investigator, Oliver Phipps, that sets forth

4    certain Apparel sales on an individual basis ("Sales Chart").  Doc. #420 Ex. C.  Plaintiffs

5    state that Phipps relied on the HGI Letter in preparing the Sales Chart and that the Sales

6    Chart represents Phipps "best effort to extrapolate individual sales from [GTFM] data[.]"

7    *Id.*

8        Defendants state in their response that throughout this litigation Plaintiffs have relied

9    exclusively on Abalos' expert report to establish damages and that Plaintiffs have claimed

10    that the report estimated individual damages "as much as possible."  Doc. #422 at 3.

11    Defendants further state that Plaintiffs have been in possession of the HGI Letter for more

12    than two years and have never offered it as evidence of individual damages.  *Id.* at 3-4.

13    Defendants argue that Plaintiffs failure to present evidence of individual damages in response

14    to the motion for summary judgment is fatal to their claims.  *Id.* at 3.

15        Counsel for Plaintiffs does not dispute that the HGI Letter and Sales Chart were not

16    offered as evidence of individual damages prior to the June 2 hearing.  Counsel states that

17    "[d]uring preparation for the oral argument, . . . counsel had a brain storm as to how to solve

18    the Rubik's cube regarding the aggregate nature of Plaintiffs' expert report.  The [HGI

19    Letter] . . . could be used to provide a percentage for a player by player application."

20    Doc. #424 at 5.  Counsel asks the Court to consider the HGI Letter and Sales Chart since the

21    delay in figuring out a way to convert Abalos' aggregate damages to individual damages was

22    not Plaintiffs' fault.  *Id.* at 7.

23        Although GTFM discussed the individual damages issue in its motion for summary

24    judgment, it did not explicitly seek summary judgment on the issue until its reply brief.  *See*

25    Docs. ##184 at 8, 312 at 12, n.9.  Plaintiffs did not have an opportunity to respond to this

26    reply brief motion, and should in fairness be afforded an opportunity to present their evidence

27    of individual damages before summary judgment is entered against them.  *See Celotex*

28    *Corp.*, 477 U.S. at 326 (parties against whom summary judgment is entered must be given

1   notice that they have to come forward with all of their evidence).  The Court therefore will

2   grant Plaintiffs' motion for leave and will consider the HGI Letter and Sales Chart in ruling

3   on GTFM's motion for summary judgment.

4        The HGI Letter states that HGI had recently received the 2002-03 summary of sales

5   for "the Platinum FUBU/Harlem Globetrotters apparel line including those items displaying

6   [Plaintiffs'] names and identities."  Pls.' Ex. 9A.  The attached summary lists GTFM's sales

7   revenues and HGI's royalties for each individual Plaintiff and others.  *Id.*  The Sales Chart

8   also lists sales revenues and royalties on an individual basis.  Pls.' Ex. 13D.

9        As previously noted, the Restatement recognizes a disgorgement measure of damages

10  that requires Plaintiffs to prove the amount of Defendants' sales.  Restatement § 49 cmt. d.

11  Defendants then have "the burden of establishing any portion of the sales that is attributable

12  to factors other than the appropriation of the plaintiff's identity and any expenses properly

13  deducted in determining net profits."  *Id.*  The HGI Letter and Sales Chart provide the

14  amount of sales per Plaintiff for 2002-03.  Using this evidence, a reasonable jury could, with

15  reasonable certainty, determine the amount of sales for those years.  After considering

16  Defendants' arguments concerning the portion of those sales that are attributable to factors

17  other than the Plaintiffs' personas and expenses properly deducted in determining net profits,

18  the jury could award per-Plaintiff damages from the amounts in the HGI Letter and Sales

19  Chart.[12]

20       But the reasonable certainty of the amounts in the HGI Letter and Sales Chart does

21  not translate to reasonable certainty for amounts in the Abalos report.  The HGI Letter and

22  Sales Chart do not say anything about Abalos' aggregate numbers, and Ms. Abalos makes

23  no attempt to apply the HGI Letter and Sales Chart percentages in her calculations.  In effect,

24  Plaintiffs seek to make damages experts out of jurors, asking them to determine Plaintiff-

25  specific percentages from the HGI Letter and Sales Chart, determine whether those

26

27

28      [12]This conclusion does not preclude Defendants from raising evidentiary objections
to the HGI Letter and Sales Chart prior to trial.

percentages can accurately be applied to the Abalos numbers, determine what portions of the Abalos numbers, if any, should be excluded, and then calculate precise damages for each Plaintiff from the Abalos aggregate.  Such an undertaking, unaided by expert testimony, cross-examination, and counter-experts, would be tantamount to inviting the jurors to engage in speculation and conjecture.  *See Ervco, Inc. v. Texaco Refining & Mktg., Inc.*, 422 F. Supp. 2d 1084, 1086 (D. Ariz. 2006) (stating that any jury award would be based on mere speculation where the plaintiffs failed to present expert testimony calculating their damages).[13]  Moreover, because Plaintiffs have not previously disclosed this mix-and-match approach to calculating individual damages from the Abalos numbers, Defendants unfairly have been denied the opportunity to designate a counter expert on the calculation.

The Court accordingly reaches these conclusions: (1) Plaintiffs may use the HGI Letter and Sales Chart to prove damages for the specific years and amounts addressed in those documents; (2) Plaintiffs will not be permitted to use the HGI Letter and Sales Chart to extrapolate individual damages from Abalos' aggregate numbers or to ask the jury to do so; (3) because the Abalos report and testimony contains no individualized damages calculation, it is irrelevant and may not be presented at trial.  The Court will deny GTFM's motion for summary judgment to the extent Plaintiffs may establish damages based on the HGI Letter and Sales Chart numbers, but will grant the motion with respect to aggregate damages contained in the Abalos report.[14]

**C.     Count III – Unjust Enrichment.**

"Unjust enrichment occurs when one party has and retains money or benefits that in

---

[13]*Cf. Paper Sys. Inc. v. Mitsubishi Corp.*, 193 F.R.D. 601, 614 (E.D. Wis. 2000) (granting class certification motion where an expert witness' "model allow[ed] aggregate estimated damages to be allocated to individual customers"); *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. 450, 517 (D.N.J. 1997) (granting class certification motion where there was evidence of aggregate damages and the jury could "determine, *with the assistance of expert testimony*, a formula that would later be applied to individual class member to compute damages") (emphasis added).

[14]Given this ruling, the Court need not address GTFM's arguments that Abalos' report is inadmissible under Federal Rule of Evidence 702.  *See* Doc. #189.

justice and equity belong to another." *Trustmark Ins. Co. v. Bank One, Ariz., N.A.*, 48 P.3d 485, 491 ¶ 31 (Ariz. Ct. App. 2002).  To prevail on an unjust enrichment claim, a plaintiff must show:  (1) an enrichment, (2) an impoverishment, (3) a connection between the enrichment and the impoverishment, (4) the absence of justification for the enrichment and the impoverishment, and (5) the absence of a legal remedy.  *See id.*

Defendants argue that Plaintiffs have not suffered an impoverishment because it is undisputed that Plaintiffs did not lose any income as a result of Defendants' actions. Docs. ##184 at 16-17, 195 at 22-24 (citing Pls.' Dep. Test.).  Plaintiff Lemon does not address this issue or the other unjust enrichment elements.  Instead, Lemon addresses "quantum meruit," the measure of damages for unjust enrichment. Docs. ##247 at 9-11, 282 at 15-16.  The Neal Plaintiffs contend that they have been impoverished because in the past they received certain endorsement benefits "under their course of business with the predecessors to HGI."  Doc. #288 at 25.

Plaintiffs, however, have presented no evidence that they would have reached an endorsement agreement with Defendants or that they have been deprived of other endorsement deals due to Defendants' use of Plaintiffs' names and likenesses.  In fact, Plaintiff Rivers has testified that the Apparel may have enhanced his name and stature and Plaintiff Lemon has testified that he currently licenses his name and likeness to endorse other products. Docs. ##184 at 17 (citing Rivers Dep. at 77), 282 at 14 (citing Lemon Aff. ¶ 12). The Court thus concludes that Plaintiffs have not suffered an impoverishment.  *See Stapley v. Am. Bathtub Liners, Inc.*, 785 P.2d 84, 88 (Ariz. Ct. App. 1989) ("[T]he evidence does not support a finding that the Stapleys suffered an impoverishment.  ABL's occupation of the premises does not appear to have caused the Stapleys . . . to be deprived of funds that they might otherwise have received."); *Carter v. Safeway Stores, Inc.*, 744 P.2d 458, 461 (Ariz. Ct. App. 1987) ("The Carters have failed to show any evidence of an impoverishment.  The record shows they are continuing to receive the same amount of rent they always received."); *City of Sierra Vista v. Cochise Enters., Inc.*, 697 P.2d 1125, 1132 (Ariz. Ct. App. 1984) ("Here, there was no impoverishment since the hook-up to the City sewer system enhanced

the value of its lots by making them eligible for financing and saleable."). The Court will grant summary judgment in Defendants' favor on Count III.

### D.   Count IV – False Light Invasion of Privacy.

"False light invasion of privacy . . . protects against the conduct of knowingly or recklessly publishing false information or innuendo that a 'reasonable person' would find 'highly offensive.'" *Godbehere v. Phoenix Newspapers, Inc.*, 783 P.2d 781, 786 (Ariz. 1989). To be actionable, the defendant's conduct need not rise to the level required for the tort of intentional infliction of emotional distress, which requires proof that the defendant's conduct exceeded all bounds of decency. *Id.* The Arizona Supreme Court has made clear, however, that the "standards for proving false light invasion of privacy are quite 'stringent' by themselves" and that the tort protects against a "narrow class of wrongful conduct" that falls just short of "outrage." *Id.* at 786-87. "Thus, the plaintiff's subjective threshold of sensibility is not the measure, and 'trivial indignities' are not actionable." *Id.* at 786 (citing Restatement (Second) of Torts § 652E (1977)); *see Hart v. Seven Resorts, Inc.*, 947 P.2d 846, 854 (Ariz. Ct. App. 1997).

Defendants argue that Plaintiffs have presented no evidence of highly offensive conduct in this case. Docs. ##184 at 18, 195 at 22. The Court agrees. A reasonable person would not find highly offensive the implication that Plaintiffs, former Harlem Globetrotters players, endorsed Harlem Globetrotters-related apparel.[15] Plaintiff Lemon himself asserts that "the concept of celebrity endorsement of goods is common knowledge among consumers." Doc. #247 at 7. Lemon has also testified that he currently licenses his name and likeness to endorse other products. Doc. #282 at 14 (citing Lemon Aff. ¶ 12). The implication that Plaintiffs endorsed the Apparel, and Plaintiffs' resulting "embarrassment" that they were not consulted or compensated for the use of their names and likenesses, is not

---

[15] *Cf. Godbehere*, 783 P.2d at 787 n.2 (stating that a good example of a false light claim based on implication is where the defendant published nude photographs of the plaintiff in a magazine containing hard core pornography and racially offensive material) (citing *Douglass v. Hustler Magazine, Inc.*, 769 F.2d 1128 (7th Cir. 1985)).

1   sufficient to support a false light invasion of privacy claim.  The Court will grant summary

2   judgment in Defendants' favor on Count IV.

3       **E.    Count V – Plaintiff Lemon's Defamation Claim.**

4       "A defamation action compensates damage to reputation or good name caused by the

5   publication of false information.  To be defamatory, a publication must be false and must

6   bring the defamed person into disrepute, contempt, or ridicule, or must impeach plaintiff's

7   honesty, integrity, virtue, or reputation." *Godbehere*, 783 P.2d at 787 (citations and emphasis

8   omitted); *see Turner v. Devlin*, 848 P.2d 286, 292 (Ariz. 1993) (quoting *Godbehere*).

9       Defendants argue that Lemon has presented no evidence of any defamatory statements

10  or damage to his reputation.  Doc. #195 at 24-25.  Lemon contends that Defendants made

11  defamatory statements in an Arizona Republic newspaper article, the book "Spinning the

12  Globe," and press interviews for the book.  Doc. #282 at 16-17.  The Court will address each

13  of these alleged defamatory statements.

14      **1.    The Arizona Republic Article.**

15      In a January 17, 2004 Arizona Republic article titled "Globetrotters call foul on

16  Meadowlark," Mannie Jackson stated the following:

17      [Lemon] and I talked about him [playing his 10,000th game] with the
        Globetrotters, but ultimately he needed to do it on his own . . . . I wanted him
18      to work to pass the torch to the young fellows.  But he wanted to be the show.
        We have a strong brand policy instead of a star system, and he wanted more
19      money than I could afford.

20  Doc. #283 ¶ 177, Ex. S. Lemon asserts that Jackson's statements are false because Lemon

21  does not have a reputation for selfishness and "did not decide to start his own team and not

22  rejoin the Globetrotters because he 'wanted to be the show[.]'" Doc. #282 at 17.  Lemon,

23  however, cites no evidence in support of this assertion.

24      Moreover, Lemon has testified that the only thing he considered defamatory about the

25  article was the statement that he was "competing" against the Harlem Globetrotters.

26  Doc. #196 ¶ 126 (citing Lemon Dep. at 141-42).  That statement, however, was made by

27  author Craig Harris, not Jackson.  *See* Doc. #283 Ex. S.  Even Lemon himself seems to

28  acknowledge that Jackson did not make the statement:

1     Q:    Mr. Lemon, are you alleging that Mr. Jackson . . . made defamatory comments
2              in this article about you?

3     A:    *This article* says that I am competing against the Harlem Globetrotters, and I
4              never wanted to compete against the Globetrotters.  No, other than that.

5 Lemon Dep. at 141 (emphasis added).

6                 **2.**      **The Book "Spinning the Globe."**

7       Lemon asserts that Jackson made defamatory statements about Lemon and other

8 Harlem Globetrotters players in Ben Green's book "Spinning the Globe."  Doc. #282 at 16.

9 Lemon, however, does not identify the alleged defamatory statements.  Defendants state that

10 while there are some unflattering comments about Lemon in the book, such comments were

11 made by Lemon's fellow players, not Jackson.  Doc. #351 at 17.  At oral argument, Lemon's

12 counsel stated that the defamatory statements were that Lemon was selfish and "wanted to

13 be the star."  The Court has reviewed the portions of the book submitted by Lemon and has

14 found no such statements attributed to Jackson.  *See* Doc. 283 Ex. T.

15                 **3.**      **Press Interviews for "Spinning the Globe."**

16       Lemon has testified that Jackson made defamatory statements about Plaintiff in press

17 interviews for "Spinning the Globe."  Doc. #283 Ex. X ¶ 13.  Lemon, however, fails to

18 identify the alleged defamatory statements.  *See id.*

19       In sum, Lemon has presented no evidence of any defamatory statements made by

20 Mannie Jackson.  Nor has Lemon presented any evidence that he has suffered damage to his

21 reputation or good name.  The Court accordingly will grant summary judgment for

22 Defendants on Count V.

23      **F.**      **Defendants' Argument that They Are Not Proper Defendants.**

24       Defendants HGIF and Mannie and Catherine Jackson argue that they are not proper

25 defendants with respect to Counts I through IV because HGI was the party to the licensing

26 agreement with GTFM – not HGIF or the Jacksons.  Doc. #195 at 2-3.

27                 **1.**      **HGIF.**

28       The parties do not dispute that HGIF received some of HGI's royalties from the

1   licensing agreement.  Defendants state that this was well after the agreement was negotiated
2   and signed by HGI.  Doc. #195 at 3.  Defendants argue that simply receiving funds does not
3   make HGIF liable for the alleged wrongful acts committed by HGI.  *Id.*  Plaintiffs do not
4   address this argument.  *See* Docs. ##282 at 4-5, 288 at 24.  The Court accordingly will grant
5   summary judgment in HGIF's favor and dismiss it from the case.

6                              **2.      Mannie and Catherine Jackson.**

7           Defendants contend that Plaintiffs cannot simply assert Mannie Jackson's position as
8   HGI's chief executive officer to show individual liability because courts have "'consistently
9   stated that a corporate executive will not be held vicariously liable for torts, merely by virtue
10  of his office.'"  Doc. #351 at 2 (quoting *Murphy Tugboat Co. v. Shipowners & Merchants
11  Towboat Co.*, 467 F. Supp. 841, 854 (N.D. Cal. 1979)).  Plaintiffs argue that corporate
12  officers who authorize, direct, or participate in tortious activity are personally liable.  Doc.
13  #288 at 22-23 (citing *Coastal Abstract Serv. Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725,
14  734 (9th Cir. 1999); *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1021
15  (9th Cir. 1985)).  Plaintiffs have presented evidence that Mannie Jackson participated in the
16  licensing agreement negotiations and recommended and approved Apparel designs.  Docs.
17  ##282 at 2-3, 288 at 22.  Construing the evidence in Plaintiffs' favor, a jury reasonably could
18  conclude that Mannie Jackson personally participated in the alleged wrongful conduct and
19  therefore is personally liable.  *See Coastal Abstract Serv.*, 173 F.3d at 734 ("'A corporate
20  officer or director is, in general, personally liable for all torts which he authorizes or directs
21  or in which he participates, notwithstanding that he acted as an agent of the corporation and
22  not on his own behalf.'") (quoting *Transgo*, 768 F.2d at 1021); *Murphy Tugboat*, 467 F.
23  Supp. at 854 (same).  Catherine Jackson's potential liability is based on her marriage to
24  Mannie Jackson and Arizona's community property laws.  The Court accordingly will deny
25  summary judgment with respect to this issue.

26  **III.    HGI's Counterclaim Against Lemon.**

27          HGI alleges in its counterclaim that Lemon has infringed and diluted HGI's registered
28  "Hand and Ball" trademark.  Doc. #83.  Lemon argues that his logo, a caricature of himself

1    spinning a basketball with red, white, and blue vertical stripes on his fingertip, does not

2    create a likelihood of confusion with HGI's mark, a picture of a person's hand, from the wrist

3    up, spinning a basketball with red, white, and blue horizontal stripes with "Harlem

4    Globetrotters" in block lettering printed across it.  Doc. #197 at 16-17.  HGI states that

5    it appears that Lemon has ceased the sale of the basketballs containing the infringing logo

6    since "all links on his website to basketball sales are 'dead.'"  Doc. #259 at 15.  HGI further

7    states that since it was primarily interested in injunctive relief, it "would consent to a

8    dismissal of these claims on the merits without prejudice[.]"  *Id.*

9         In response to Lemon's motion for summary judgment, HGI had the burden of

10   presenting evidence sufficient to create a triable issue.  *See* Fed. R. Civ. P. 56(c); *Celotex*,

11   477 U.S. at 322.  HGI has not attempted to meet this burden.  The Court accordingly will

12   grant summary judgment in Lemon's favor on HGI's counterclaim.

13   **IV.    Defendants' Motions to Strike Untimely Disclosures.**

14        GTFM moves to strike Lemon's third supplemental disclosure statement as untimely.

15   Doc. #231.  HGI and the Jacksons move to strike the Neal Plaintiffs' second supplemental

16   disclosure statement and evidence submitted by Plaintiffs in May 2006 in support of their

17   summary judgment arguments.  Docs. ##405, 410; *see* Docs. ##392-401, 407-09.

18        The Court will deny the motions to strike as moot.  The Court did not consider the

19   Neal Plaintiffs' May 2006 submissions in ruling on the summary judgment motions because

20   the submissions were untimely and Plaintiffs failed to show good cause for their

21   untimeliness.  *See* Doc. #173 ¶ 3 (Rule 16 scheduling order setting October 28, 2005

22   dispositive motion deadline); Fed. R. Civ. P. 16(b) (stating that the district judge shall enter

23   a scheduling order and that the "schedule shall not be modified except upon a showing of

24   good cause and by leave of the district judge"); *Johnson v. Mammoth Recreations, Inc.*, 975

25   F.2d 604, 609 (9th Cir. 1992) ("Rule 16(b)'s 'good cause' standard primarily considers the

26   diligence of the party seeking the amendment."); *Wong v. Regents of the Univ. of Cal.*, 410

27   F.3d 1052, 1062 (9th Cir. 2005) ("Courts set [pretrial] schedules to permit the court and the

28   parties to deal with cases in a thorough and orderly manner, and they must be allowed to

1   enforce them, unless there are good reasons not to.").  To the extent Plaintiffs intend to offer

2   at trial evidence contained in their second and third supplemental disclosure statements,

3   Defendants may raise objections to such evidence in pretrial motions in limine.  The Court

4   will rule on any such objections at the final pretrial conference.

5   **V.      Defendants' Motion for Rule 11 Sanctions.**

6          Defendants HGI, HGIF, and the Jacksons seek an order imposing sanctions under

7   Rule 11 of the Federal Rules of Civil Procedure against Plaintiffs and their counsel.

8   Doc. #215.  Defendants contend that sanctions are warranted because Plaintiffs improperly

9   named HGIF and the Jacksons as defendants, Plaintiff Lemon's defamation claim was not

10  grounded in fact or law, and Lemon's answer to HGI's counterclaim improperly included a

11  third-party complaint against various individuals.  Doc. #216.  Plaintiffs argue that sanctions

12  are not warranted under Rule 11.  Docs. ##233, 238.

13         "The central purpose of Rule 11 is to deter baseless filings."  *Newton v. Thomason*,

14  22 F.3d 1455, 1463 (9th Cir. 1994).  Rule 11 justifies sanctions "when a filing is frivolous,

15  legally unreasonable, or without factual foundation, or is brought for an improper purpose."

16  *Estate of Blue v. County of L.A.*, 120 F.3d 982, 985 (9th Cir. 1997).  Rule 11, however, "is

17  not intended to permit sanctions just because 'the court later decides that the lawyer is

18  wrong.'"  *Rachel v. Banana Republic, Inc.*, 831 F.2d 1503, 1508 (9th Cir. 1987).

19         The Court concludes that Rule 11 sanctions are not warranted.  As explained above,

20  Plaintiffs did not improperly name the Jacksons as defendants, and the decision to name

21  HGIF was not so factually and legally untenable as to require sanctions.  *See Rachel*, 831

22  F.2d at 1508 (holding that Rule 11 sanctions were not appropriate where the plaintiff

23  erroneously named a corporation as a defendant in a suit against the corporation's wholly-

24  owned subsidiary because the two entities shared common officers and it appeared that the

25  corporation financed and guided the subsidiary).  Similarly, Lemon's defamation claim is not

26  "factually frivolous" for purposes of Rule 11.  *See Greenberg v. Sala*, 822 F.2d 882, 886-87

27  (9th Cir. 1987) (affirming denial of Rule 11 motion and stating:  "[W]e resist an

28  interpretation of Rule 11 that would blur the roles of attorneys and finders of fact.  We hold

that a complaint based on reasonable inquiry should not be found to be factually frivolous unless some clear authority or a litigant's own clear admission erases the factual underpinning from some essential element of the litigant's pleading."). The fact that summary judgment will be granted in Defendants' favor on the defamation claim "is not dispositive of the issue of sanctions[.]" *Rachel*, 831 F.2d at 1508. Finally, Lemon erroneously included the third-party defendants in his answer to HGI's counterclaim after having voluntarily dismissed the third-party defendants in a prior notice. *See* Docs. ##89, 144. Lemon makes clear in his response to the Rule 11 motion that the inclusion of the third-party defendants in his answer to HGI's counterclaim was an inadvertent mistake and that he has not sought to reinstate the claims against the third-party defendants. Doc. #233 at 4-6.[16] The Court will deny Defendants' motion for Rule 11 sanctions.

**IT IS ORDERED:**

1.    Defendant GTFM's motion for summary judgment (Doc. #180) is **granted in part** and **denied in part** as set forth in this order.

2.    Defendant GTFM's motion to strike expert report (Doc. #189) is **denied** as moot.

3.    Defendant GTFM's motion to strike Plaintiffs' third supplemental disclosure statement (Doc. #231) is **denied** as moot.

4.    The HGI Defendants' motion for summary judgment (Doc. #194) is **granted in part** and **denied in part** as set forth in this order.

5.    Defendant Harlem Globetrotters International Foundation is **dismissed**.

6.    The HGI Defendants' motion to strike affidavit of Edwin Mutum (Doc. #268) is **denied** as moot.

7.    The HGI Defendants' motions to strike and preclude Plaintiffs' untimely disclosures (Docs. ##405, 410) are **denied** as moot.

---

[16]The Clerk of Court has not reinstated the third-party defendants as parties in this action.

1    8.    The HGI Defendants' motion for sanctions (Doc. #215) is **denied**.

2    9.    Plaintiff Meadowlark Lemon's motion for summary judgment (Doc. #197) is

3    **granted in part** and **denied in part** as set forth in this order.

4    10.    The Neal Plaintiffs' motion for summary judgment (Doc. #279) is **denied**.

5    11.    The Neal Plaintiffs' motion for judicial notice (Doc. #319) is **denied**.

6    12.    The Neal Plaintiffs' motion for leave to answer the Court's request for

7    evidence location (Doc. #419) is **granted**.

8    13.    Defendants' motion regarding oral argument (Doc. #402) is **denied** as moot.

9    14.    Defendants FUBU the Collection's and GTFM of Orlando's motion to strike

10   portions of the Neal Plaintiffs' reply  (Doc. #320) and motion to strike the affidavit of Peter

11   Gallo (Doc. #413) are **denied** as moot.

12   15.    The Court will set a final pretrial conference by separate order.

13   DATED this 27th day of June, 2006.

14

15

16   _____

17                    David G. Campbell
                 United States District Judge

18

19

20

21

22

23

24

25

26

27

28