**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Meadowlark Lemon, a married man, ) | No. CV-04-299-PHX-DGC |
| Plaintiff, ) | No. CV-04-1023-PHX-DGC |
| vs. ) | (Consolidated Cases) |
| Harlem Globetrotters International, Inc., ) an Arizona corporation; et al., ) | **ORDER** |
| Defendants. ) | |

On February 8, 2007, the jury returned a verdict in favor of Plaintiff Meadowlark Lemon in the amount of $783,900. Dkt. #595. Defendants have filed a motion for judgment as a matter of law (Dkt. #614) and a motion for a new trial on liability and compensatory damages (Dkt. #615). For the reasons set forth below, the Court will deny these motions.[1]

**I.   Defendants' Motion for Judgment as a Matter of Law.**

A motion for judgment as a matter of law "should be granted only if 'there is no legally sufficient basis for a reasonable jury to find'" for the party that prevailed at trial. *Winarto v. Toshiba Electronics Components, Inc.*, 274 F.3d 1276, 1283 (9th Cir. 2001) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S., 133, 149 (2000)). In ruling on the motion, the

---

[1] Defendants' request for oral argument (Dkt. #628) is denied. The parties have fully briefed the issues and the Court is familiar with the evidence and the parties' positions. Oral argument would not aid the Court's decision.

Court "is not to make credibility determinations or weigh the evidence and should view all inferences in the light most favorable to the non-moving party." *Id*. The Court must "'disregard all evidence favorable to the moving party that the jury is not required to believe.'" *Id*. (quoting *Reeves*, 530 U.S. at 151).

### A. Plaintiff's Consent Through Conduct.

Defendants argue that Plaintiff consented to Defendants' use of his name and number on FUBU apparel through his conduct over the course of 25 years, and that no reasonable jury could have concluded otherwise. The Court disagrees.

Exhibit 1115 is a 1975 contract between Plaintiff and the Globetrotters. The contract provided that the Globetrotters could use Plaintiff's name and number in perpetuity, provided the use was the same as that which occurred while Plaintiff played for the team. Plaintiff testified that the Globetrotters did not sell clothing bearing his name and number through retail outlets during his playing years. Dkt. #608 at 92-93. Although he conceded that the Globetrotters may have sold T-shirts bearing his name and number at Globetrotter basketball games, he testified that the Globetrotters never used his name and number on retail clothing sold through retail outlets. *Id*. Defendants presented no contrary evidence.

Plaintiff testified that he first learned of Defendants' retail-clothing use of his name and number while ministering in Kansas many years after his playing career. *Id*. at 83-84. Plaintiff thereafter spoke with an attorney, who then wrote a letter of complaint to Defendant HGI. *Id*. at 114-115.

Defendants argue that the Globetrotters used Plaintiff's name and number for years on a variety of non-clothing merchandise such as trading cards, posters, a record album cover, a viewmaster, lunch boxes, and cartoons. The jury reasonably could have concluded, however, that these uses were different than the use of Plaintiff's name and number on retail clothing. Defendants also argue that Plaintiff's name appeared on T-shirts sold at games and iron-ons that could be applied to clothing, but this too could be viewed as different from commercially

produced retail clothing sold through hundreds of retail outlets. Defendants further contend that Plaintiff did not complain to Mannie Jackson about the use of his name and number on FUBU clothing after he had learned of the clothing, even though Plaintiff had several occasions to do so, but the jury could have concluded that he chose to hold his peace and let his lawyer raise the issue with HGI.

The evidence reasonably supported a jury finding that Plaintiff did not consent to the use of his name and number on FUBU retail clothing, objected to such use when he learned about it, and elected not to address it personally with Mr. Jackson at social events.

### B.     Consent Through the 1975 Contract.

Defendants argue that Plaintiff consented to their use of his name and number on FUBU clothing through his 1975 player contract, and that a reasonable jury could not have found otherwise. Again, the Court disagrees.

As noted above, the 1975 contract (Ex. 1115) permitted the Globetrotters to use Plaintiff's name and number in the same manner as they were used during his playing years. Plaintiff testified that his name and number were not used on retail clothing while he was a player. Although Defendants argued that his name and number were used on T-shirts sold at basketball games and on iron-ons, the jury reasonably could have concluded that these uses were not the same as placing Plaintiff's name and number on a wide array of retail clothing sold in retail stores throughout the United States.

Moreover, Plaintiff's counsel raised numerous questions through cross-examination as to whether the 1975 contract was acquired by HGI in the HGI asset purchase agreement (Ex. 19). Plaintiff's counsel presented evidence and argument that the 1975 contract was never specifically identified in the asset purchase agreement, that portions of the agreement concerning the transfer of assets did not list player contracts generally or Plaintiff's contract specifically, and that Defendant Jackson's business plan (Ex. 1186) stated that he would promote a team image and not rely on individual players. Defendants argued for a different

reading of the asset purchase agreement and business plan, but a reasonable jury could have found Plaintiff's reading more credible.  Furthermore, the jury could have concluded from cross-examination that those who testified that all assets were to be transferred did not know whether player contracts were intended to be among the acquired assets.  Plaintiff's counsel presented evidence that a search for former player contracts was not conducted, that Defendants' statements about the nature of player contracts being uniform were inaccurate, and that numerous lawyers involved in the transaction failed to specify in the agreement that Plaintiff's contract was being transferred.  The Court concludes that a reasonable jury could have found that the 1975 contract was not transferred.

### C. Consent Through the Collective Bargaining Agreement.

Defendants argue that Plaintiff consented to the use of his name on FUBU clothing through a collective bargaining agreement between the Globetrotters and a former players' union, and that a reasonable jury could not have found otherwise.  The Court disagrees.

Although Defendants placed the collective bargaining agreement in evidence, other testimony suggested that the players' union was disbanded before the assets of the Globetrotters were acquired by HGI. Defendants presented no evidence that the players' union and its collective bargaining agreement remained in effect at the time Defendants began producing FUBU clothing bearing Plaintiff's name and number. The jury therefore reasonably could have concluded that the collective bargaining agreement no longer applied.

Defendants themselves have argued in this litigation that the collective bargaining agreement no longer exists: "There is no evidence the union currently exists or that collective bargaining agreements it once negotiated are still effective."  Dkt. #504 at 2.  The jury reasonably could have reached the same conclusion.

### D. Damages.

Defendants argue that the jury's damages award was not supported by the evidence. This argument is also made in Defendants' motion for new trial.  For the reasons set forth

below, the Court concludes that Plaintiff provided a reasonable basis for the jury to find that Defendants had not met their burden of proving costs incurred in the manufacturing and marketing of the FUBU clothing or of proving that Plaintiff's name and number did not contribute to the sales. Sufficient evidence therefore supported the jury's damages award.

**II.    Defendants' Motion for New Trial.**

Defendants argue that the jury's verdict is against the clear weight of the evidence and that the Court should therefore grant a new trial under Rule 59(a). There are significant differences between a Rule 50 motion for judgment as a matter of law and a Rule 59(a) motion for a new trial. A court may not grant a Rule 50 motion if there is substantial evidence to support the verdict. "The existence of substantial evidence does not, however, prevent the court from granting a motion for new trial pursuant to [Rule 59(a)] if the verdict is against the clear weight of the evidence." *Landes Constr. Co. v. Royal Bank of Canada*, 833 F.2d 1365, 1371 (9th Cir. 1987). In deciding a Rule 59(a) motion, "[t]he judge can weigh the evidence and assess the credibility of witnesses, and need not view the evidence from the perspective most favorable to the prevailing party." *Id.*; *see also Molski v. M.J. Cable, Inc.*, ___ F.3d ___, 2007 WL 865532, at *3 (9th Cir. Mar. 23, 2007).

The Ninth Circuit has provided the following guidance for ruling on a Rule 59(a) motion:

> On the one hand, the trial judge does not sit to approve miscarriages of justice. His power to set aside the verdict is supported by clear precedent at common law and, far from being a denigration or a usurpation of jury trial, has long been regarded as an integral part of trial by jury as we know it. On the other hand, a decent respect for the collective wisdom of the jury, and for the function entrusted to it in our system, certainly suggests that in most cases the judge should accept the findings of the jury, regardless of his own doubts in the matter. . . . If, having given full respect to the jury's findings, the judge on the entire evidence is left with the definite and firm conviction that a mistake has been committed, it is to be expected that he will grant a new trial.

*Landes*, 833 F.2d at 1371-72 (quoting 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2806, at 48-49 (1973) (footnotes omitted)).

**A.     Liability.**

Defendants argue that the jury's liability determination was against the clear weight of the evidence. Specifically, Defendants argue that Plaintiff consented to use of his name and number through 25 years of conduct, through a collective bargaining agreement, and through the 1975 player contract. The Court must decide this issue on the basis of its own evaluation of the evidence and witness credibility. The question, however, is not what the Court would have done had it sat on the jury. The question is whether the jury's verdict is against the *clear* weight of the evidence – whether the Court is left with a definite and firm conviction that a mistake was made.

The Court is not left with such a definite and firm conviction. A fair weighing of the evidence permitted the following findings: (1) Plaintiff's acquiescence in 25 years of commercial use of his name and number for non-retail-clothing products did not constitute consent to the use of his name and number on FUBU retail clothing; (2) no evidence demonstrated that the collective bargaining agreement was in existence at the time of the FUBU deal, and significant evidence suggested that the union no longer existed; and (3) the 1975 contract did not authorize the retail-clothing use of Plaintiff's name and number because such use never occurred while Plaintiff was a player. To be sure, these findings do not constitute the only reasonable view of the evidence. Fair minds could differ on the proper interpretation of the evidence. But the Court concludes that these findings fall within the range of reasonable interpretations of the evidence. The Court therefore holds that the liability verdict was not against the clear weight of the evidence and a new trial on liability is not warranted.

**B.     Damages.**

Defendants argue that the jury's award of $783,900 in damages was contrary to the clear weight of the evidence. Defendants contend that the jury disregarded undisputed evidence of costs incurred in the production and marketing of the FUBU apparel.

-6-

The Court provided the following instructions to the jury on compensatory damages:

> In a claim for violation of the right of publicity, plaintiff may recover the proportion of defendants' net profits that is attributable to the unauthorized use of plaintiff's name, likeness, or identity.
>
> To determine the amount of such profits, you should consider the following: Plaintiff has the burden of establishing by a preponderance of the evidence, A, the sales revenue defendants received from selling products bearing plaintiff's name, likeness, or identity. Defendants then have the burden of establishing by a preponderance of the evidence, B, any portion of the sales revenue that is attributable to factors other than appropriation of plaintiff's name, likeness, or identity; and, C, any expenses incurred by defendants in the production or marketing of the product bearing plaintiff's name, likeness, or identity.
>
> In arriving at the plaintiff's damages, you should start with A, and subtract B and C.

Dkt. #609 at 151-52.

The Court also provided the following instruction on the burden of proof:

> When a party has the burden of proof on any claim or affirmative defense by a preponderance of the evidence, it means you must be persuaded by the evidence that the claim or affirmative defense is more probably true than not true.

*Id.* at 148.

Plaintiff established that Defendants' total sales revenue for the apparel in question was $783,900. Ex. 24. Defendants did not dispute this number. In seeking to establish amounts that should be deducted from this number, Defendants presented the testimony of Bruce Weisfeld, a co-owner of Defendant GTFM. Mr. Weisfeld testified that Samsung receives 13% of all GTFM sales in consideration for various services it provides to GTFM. He also testified that GTFM has general overhead costs totaling 17% of sales. Finally, Mr. Weisfeld testified that numbers set forth on Exhibit 1094A reflect the actual costs of making the FUBU apparel at issue in this case. Defendants also presented the testimony of Larry Blenden, in-house general counsel of GTFM. Mr. Blenden confirmed that Samsung receives 13% of all sales. Subtracting the Samsung, overhead, and manufacturing costs from the gross sales figure of

$783,900, Defendant argued that Plaintiff was entitled to no more than $164,750 in profits. Dkt. #609 at 99.

Defendants also presented testimony from Daymond Aurum, Bruce Weisfeld and others that the FUBU clothing in question was not purchased because it bore Plaintiff's name and number. They testified that the clothing was purchased because it bore the FUBU label and the Harlem Globetrotters name, and because of style, color, and other clothing features. Defendants argued that Plaintiff's name and number accounted for such a small percentage of the sales that Plaintiff's damages should either be ten percent of $164,750 or zero. *Id.* at 100.

Plaintiff challenged the reliability of Defendants' cost evidence and their opinions on why the clothing was purchased. Plaintiff argued that Defendants' evidence could not be believed and that Defendants therefore had not satisfied their burden of proving that the gross sales number should be reduced under the jury instructions.

Plaintiff specifically attacked the testimony of Bruce Weisfeld, noting that he had provided no supporting documentation for the 13% Samsung payment or the 17% overhead figure. Plaintiff noted that Mr. Weisfeld had provided only a single typewritten sheet setting forth these amounts – a sheet he typed and provided to Defendants' lawyer. Plaintiff also argued that Mr. Weisfeld was an interested party as a co-owner of Defendant GTFM. Plaintiff attacked the credibility of Mr. Blenden as well, arguing that he was an in-house attorney for Defendants and was less than forthcoming in his testimony about CAD drawings.

To establish the cost of producing the apparel in question, Defendants introduced Exhibit 1094A. This was a summary chart that purported to summarize sales detail reports produced during discovery. The Court provided the following instruction to the jury concerning summary charts:

> Certain charts and summaries have been received into evidence to illustrate information brought out in the trial. Charts and summaries are only as good as the underlying evidence that supports them. You should therefore give them only such weight as you think the underlying evidence deserves.

Dkt. #609 at 147.

Plaintiff attacked the underlying basis for Exhibit 1094A. Plaintiff noted that there was an error in Exhibit 24. Defendants conceded the error, stating that an incorrect style number had been listed. Plaintiff suggested that other errors or intentional omissions had occurred in the compilation of Defendants' cost numbers.

Plaintiff also notes in its memorandum that Defendants failed to place in evidence most of the sales charts underlying Exhibit 1094A. Because the Court instructed the jury that the chart was only as good as the underlying evidence, and Defendants failed to present most of the underlying evidence, Plaintiff contends that the jury reasonably could have decided that the chart was not reliable.

Plaintiff argued that Defendants presented no outside witness to support any of its cost numbers. He argued that Defendants are substantial companies with in-house staffs and auditors. Yet no auditor or outside expert was called to establish any of the cost numbers asserted by Defendants during the trial.

Moreover, all of the cost evidence was presented by Defendant GTFM. Plaintiff produced evidence that Defendant HGI had sued GTFM and had claimed in the lawsuit that GTFM's accounting was not accurate. Thus, Plaintiff suggested, even GTFM's co-defendant did not trust its numbers.

Plaintiff argued vigorously during closing argument that Defendants' witnesses were not credible and that Defendants had presented no reliable documentation or outside evidence to support its cost assertions. Therefore, Plaintiff argued, Defendants had not met their burden of proving the costs to be deducted from the gross sales number of $783,900. On this basis, Plaintiff asked the jury to award him the full amount of $783,900.

The jury's award of this amount demonstrates that it accepted Plaintiff's arguments. The jury chose not to believe the cost evidence presented by Defendants. Although it is true that Plaintiff did not present competing cost numbers, Plaintiff did vigorously and repeatedly

assert that Defendants' cost numbers and testimony were not reliable and should not be accepted by the jury.

Plaintiff also attacked the credibility of Defendants' assertion that Plaintiff's name and number had nothing to do with sales of the clothing in question. Plaintiff attacked the credibility of Mr. Aurum, particularly his statement as a clothing designer for young men in an urban environment that he did not know what a basketball jersey looked like. Plaintiff also attacked the credibility of Mr. Aurum's testimony that young FUBU customers would think that "Harlem Globetrotters" referred to international rap stars. The jury also saw CAD drawings that featured Plaintiff's name and number over those of other players, suggesting Defendants themselves saw value in the use of Plaintiff's name and number. The jury also saw evidence in Exhibit 24 that FUBU clothing with Plaintiff's name and number significantly outsold comparable FUBU clothing with the names and numbers of other Globetrotter players, suggesting that Plaintiff's name and number did influence sales. From all of this evidence the jury reasonably could have rejected Defendants' claim that Plaintiff's name and number had nothing to do with the sales in question.

In short, the jury did not believe Defendants' evidence. The question is whether that decision was so contrary to the weight of the evidence that a new trial is required. The Court concludes that it is not. Having watched the GTFM witnesses and considered their evidence, as well as Plaintiff's attacks on the credibility of the evidence, the Court concludes that rejection of Defendants' evidence was within the range of reasonable interpretations of all the evidence at trial. The Court is not left with a definite and firm conviction that the jury's damages award was a mistake.[2]

---

[2] Defendants clearly incurred costs in producing and marketing the goods in question. The relevant question, however, is not whether Defendants incurred costs, but whether they proved those costs by a preponderance of the evidence. Plaintiff argued vigorously that they did not, the jury accepted that argument, and the Court cannot conclude that the jury erred.

-10-

**IT IS ORDERED:**

1. Defendants' Motion for Judgment as a Matter of Law (Dkt. #614) is **denied**.
2. Defendants' Motion for a New Trial on Liability and Compensatory Damages (Dkt. #615) is **denied**.
3. Defendants' Request for Oral Argument (Dkt. #628) is **denied**.

DATED this 12th day of April, 2007.

*/s/ Daniel G. Campbell*
David G. Campbell
United States District Judge